MELSON *et al. v.* STATE.*

(Division B.   Feb. 18, 1929.)

[120 So. 570.   No. 27675.]

*Corpus Juris-Cyc. References: Burglary, 9CJ, section 132, p. 1075, n. 13; p. 1076, n. 26; Criminal Law, 16CJ, section 1568, p. 764, n. 54; Larceny, 36CJ, section 483, p. 899, n. 34; p. 903, n. 35; As to test of sufficiency of circumstantial evidence in criminal case, see 10 R. C. L. 1008; 4 R. C. L. Supp. 685; 5 R. C. L. Supp. 581.

598

*Boggan & Leake,* for appellants.

*Rufus Creekmore,* Assistant Attorney-General, for the state.

ETHRIDGE, P. J. The appellants were indicted, together with Glen Conway, by the grand jury of Prentiss county, Miss., on a charge of burglary and larceny. Melson and Bishop were tried and convicted, but Conway appears to have escaped. The appellant John Melson was sentenced for a term of three years, and John Bishop for a term of two years in the State Penitentiary; from which this appeal is prosecuted.

It appears that in March, 1927, some one broke open a henhouse belonging to George Graham and stole therefrom twenty-three chickens. These chickens, or a portion of them, were found the following day at the Beasley Produce House in Sherman, Miss. The chickens were identified by their size, color, and breed, and by a mark that was made by cutting off the back toe on the left foot of each chicken.

On the morning following the burglary, Conway and the two appellants had driven into Sherman together in a car, having the chickens therein. The appellant Bishop and Conway went up to the store or produce house, it being about the time the store opened or a few minutes prior thereto. When the store was opened, Bishop made the sale to Mr. Beasley and gave a false name. A check was made for thirty-two dollars in such name,

and the chickens were delivered. Thereafter several people entered into conversation with Bishop and Conway and became suspicious of their conduct. During the negotiation of the sale of the chickens, Melson was not present, but near by, and he had gotten out of the car at the corner of the store when the car turned to go down to the produce house, and appears to have come in front of the house and was near the door while Bishop was in the store conducting the negotiations. The appellant Bishop and Conway were dressed in common, everyday clothes, while Melson had on better clothes, designated by the witness as his Sunday clothes.

None of the state witnesses placed Melson in a position where he would necessarily have heard the conversation between Bishop and Beasley in buying the chickens. Shortly after the sale and after the conversation in which one of the witnesses pressed Bishop with numerous questions, the appellants and Conway got in the car and went toward Tupelo. Some of the witnesses said the car in which they were traveling left in a hurry. When they got to Tupelo, Melson got out and Bishop tried to cash the check, but failed to do so. Whereupon Bishop and Conway returned to Sherman, and Bishop presented the check to the bank at Sherman, which bank told him that it was instructed to hold the check until he was identified. Bishop came out of the bank, and he and Conway left, returning to Tupelo, there picking up Melson and returning home.

It appears that Beasley, who gave the check, became suspicious, as well as the other persons who had talked with Bishop and Conway, and Beasley had ordered the check held until Bishop was identified. It appears that Conway remained in the car while Bishop went into the bank to get the check cashed.

Bishop testified in his own defense, but Melson did not testify. It appears from Bishop's testimony that he and

Conway were together on the afternoon proceding the burglary and had some car trouble near a store in the community when Melson came along and asked Conway, who, Bishop testified, was the owner of the car, to take him to a brother-in-law of Melson, living three miles away, and that they did so; that thereafter he and Bishop were together, and they went to the father-in-law of Bishop shortly after dark; and that Bishop got out, and says he remained for the night, he and his wife living at the place of his father-in-law and occupying a back room in the house. On the night of the burglary, a number of people assembled at the house of the father-in-law of Bishop for a musical entertainment; there were four or five persons present other than the family. After they left, Bishop and his wife retired, and just before daylight Conway returned and called for Bishop, and he went out, and they went first to Tupelo and then on to Sherman.

Bishop's statements as to what happened at the house of his father-in-law were corroborated by his wife and his father-in-law. The father-in-law said that while it was dark when Conway called and he could not see the chickens, he heard them, and that Bishop was at his home during the night before. Bishop also testified that Melson lived some two and one-half or three miles from Bishop's place, and that he and Conway went by and called for Melson, who was at Gaston Wood's, a brother-in-law of Melson, and that Melson came out, and they asked him did he want to take a ride, and that he got into the car and went with them. Bishop further testified that nothing was said to Melson on the trip about the chickens, and that neither he nor Melson was with Conway when Conway procured the chickens; and that the first that he knew that the chickens were stolen was when they returned from the bank in Sherman; and that Conway then said that those chickens were stolen, "let's go," or,

"let's get away from here." Bishop admitted selling the chickens and giving a false name, but said Conway asked him to do that, and that he did so although he had no connection with the stealing of the chickens. Mr. Wood and his wife testified that Melson was at their house during the entire night of the burglary. Mrs. Wood was a sister of Melson, and they testified that they all slept in one room, and that Melson did not leave the house during the night.

One of the assignments of error is that the proof is insufficient to sustain a conviction both as to Bishop and as to Melson, and another is the refusing of peremptory instruction at the close of the testimony as to each of them. We think the evidence is entirely insufficient to convict the appellant Melson; there is nothing in the testimony to show that he had any connection with the burglary or any knowledge of it, but there is undisputed testimony that he did not participate in the sale of the chickens and was not present at the bank and was not present when the attempt was made to cash the check, and the proof is insufficient to show that he heard the conversation made by Bishop in negotiating sale of the chickens to Beasley, consequently the conviction of Melson must be reversed.

We think as to the appellant Bishop that the evidence was sufficient to show his connection with the burglary, and that he was a *particeps criminis* to the whole transaction. There is no merit in the other assignments of error as to Bishop, and the judgment as to the conviction of Bishop will be affirmed.

Affirmed as to Bishop; reversed and appellant Melson discharged.

*Affirmed.*
*Reversed.*